Filed 12/23/14  In re Jack D. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re JACK D. et al., Persons Coming Under the Juvenile Court Law. | D066157 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, Plaintiff and Respondent, v. Z.B. et al., Defendants and Appellants. | (Super. Ct. No. EJ3154C) |


APPEAL from a judgment of the Superior Court of San Diego County, Kenneth Medel, Judge.  Affirmed.


Terrence M. Chucas, under appointment by the Court of Appeal for Defendant and Appellant Z.B.

Suzanne Davidson, under appointment by the Court of Appeal for Defendant and Appellant D.B.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Lisa Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

Z.B. and D.B. appeal from a judgment terminating parental rights to their 10-year-old son, Jack D., and placing him for adoption. Z.B. contends that the juvenile court erred in (1) denying her petition under Welfare and Institutions Code section 388 to remove Jack from his prospective adoptive home and (2) finding inapplicable the beneficial parent-child relationship exception to adoption as the preferred placement plan for Jack; D.B. joins in these arguments. (All further statutory references are to the Welfare and Institutions Code.) We disagree and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND[1]

Z.B. has a history of alcohol and drug abuse that started when she was young. As a result of her continued alcohol and substance abuse as an adult, she was often unable to care for Jack and his older sisters, Savannah and Julia, who spent substantial time living with Z.B.'s relatives. During this same time, numerous dependency referrals were made on behalf of these children, two of which were substantiated. Z.B. was arrested in 2003 for driving under the influence and Savannah and Julia were released to the custody of Z.B.'s mother, but no dependency proceedings were initiated at that time.

In October 2009, the San Diego County Health and Human Services Agency (the Agency) received a report that Z.B. had repeatedly failed to pick up Jack from school, that Savannah, Julia and Jack were often hungry and unkempt, that Savannah was often left in charge of her siblings' care and that their home was filthy and had no electricity or

---

[1] Some of the historical factual and procedural background herein is summarized from the opinion in Z.B.'s earlier appeal in which she challenged judgments of the juvenile court making true findings on the section 300 petitions filed on behalf of Jack and Jamie, removing them from her custody and denying her reunification services. (*In re Jack D.* (D062655, Feb. 1, 2013) [nonpub. opn.].)

2

running water. The following day, Z.B. was arrested after she arrived intoxicated to pick up Jack after school. The Agency filed a section 300 petition on behalf of Savannah, Julia, Jack and their younger sister, Jamie, and the court removed the four children from Z.B.'s custody and placed them with Z.B.'s half-sister, Shannon G., and Shannon's husband, Scott.

Z.B. denied having an alcohol abuse problem and, as a result, had difficulty maintaining her sobriety until early 2010, when she began to participate in a residential treatment program and dependency drug court. After giving birth to her fourth daughter, Cassidy, in July 2010, Z.B. experienced certain additional set-backs, including a substantiated referral for general neglect relating to Cassidy in November 2010, but subsequently made substantial progress with her case plan.

By January 2011, Jack began having weekend overnight visits with Z.B. and the Agency was planning to return him to her custody. However, in April 2011, Z.B. left Julia, Jack, Jamie and nine-month-old Cassidy alone in her car for nearly an hour during a visit with her brother, Eric, at his home in Orange County. While the children were unattended, Z.B.'s brother Dustin came out to the car. Dustin had recently been released from prison and was subject to a restraining order prohibiting him from having contact with Z.B., Savannah, Julia and Jack, as a result of a prior incident of domestic violence. Jack later told Z.B. about the incident and she instructed him not to tell anyone about it. Z.B. initially denied to the social worker that she had left the children alone "for more than a few seconds," but later asserted, apparently falsely, that their maternal grandmother had been in the car with them.

3

In July 2011, Savannah disclosed to Shannon that she had been molested by Eric on numerous occasions between 2005 and 2008, when the family was living with him.[2] As a result of this disclosure, the Agency postponed its plan to give Z.B. trial custody of Jack. However, he was ultimately returned to her care in September 2011. Z.B. also reunified with Jamie.

Based on Z.B.'s successful reunification, the dependency proceedings relating to Jack and Jamie were dismissed in March 2012. Although Z.B. knew that any relapse in alcohol use would likely result in the children's permanent removal, she reduced her AA meeting attendance to once a week. The Agency also began to receive reports that Jack was again coming to school dirty and unkempt, had stopped turning in his homework, and was no longer making academic progress.[3] Jack also exhibited behavioral problems, both at home and at school, which his therapist attributed to the trauma of frequent moves during his life.

In April 2012, the juvenile court terminated Z.B.'s parental rights to Savannah and Julia and placed the girls with Shannon and Scott for adoption. Less than two weeks later, Z.B. was found passed out in her car as she waited to pick up Jack from school. Jamie and Cassidy, who were in the car with her, were dirty and the car was filthy. Although Z.B. claimed that her blood pressure medication had made her drowsy, when

---

[2]     Savannah's allegations were later substantiated and Eric was arrested, convicted and sentenced to 125 years in prison.

[3]     Jack had also had school attendance issues, with 11 absences and 16 tardies for the 2011-2012 school year.

confronted with reports from school staff that she had smelled of alcohol, she admitted having had one drink in the morning and that she might test positive for alcohol.

As a result of this incident and an earlier report that Z.B. had been under the influence when driving Jack and his younger sisters to a restaurant, the Agency filed new section 300 petitions in May 2012 and placed the children in foster care. Shortly thereafter, Z.B. requested voluntary services, enrolled in a Family Recovery Center outpatient program, started a host of classes and drug testing and began regular visitation. However, due to her substance abuse history, the termination of her parental rights to Savannah and Julia and her demonstrated inability to remain sober absent court and Agency supervision, the Agency requested that the juvenile court deny her reunification services.

Because Z.B. had shown success in her recent treatment, she argued at the contested jurisdictional and dispositional hearing that her prompt participation in voluntary services established the absence of a risk of harm of returning the children to her and that the court should either (a) dismiss the dependency petition or (b) return Jack and Jamie to her care and authorize reunification services for her. The court made jurisdictional and dispositional findings, removed Jack and Jamie from Z.B.'s care and denied reunification services to Z.B., although it authorized services for D.B.

Jack was placed in Shannon and Scott's home in October 2012,[4] after which his behavioral issues at home and in therapy began to diminish. Z.B.'s visitation with Jack decreased, but she continued to participate in services on her own. Although the Agency

---

[4]     Jamie and Cassidy were later placed there, too.

was confident that Z.B. would do well in services, it was concerned that she would relapse again after the services ended, as she had in the past.

In February 2013, the juvenile court authorized Z.B. to have short, unsupervised visits with Jack. After the visits started, however, Jack began exhibiting more negative behaviors, including defiance and aggressive outbursts. His therapist opined that the visits with Z.B. were causing him to experience increased anxiety and confusion.

Jack also continued to struggle behaviorally at school and, although he had made some progress academically, he was performing so substantially below grade level in third grade that he was at risk of being held back.[5] However, after Shannon hired a tutor for Jack, his academic work improved.

In the spring and summer of 2013, relatives and coworkers reported that Z.B. was drinking again. She had reportedly shown up drunk at work and at social events on numerous occasions, and in July, she lost her job as a result of her relapse.[6] Z.B. steadfastly maintained, however, that she had relapsed on only one evening in May.

In August 2013, Z.B.'s unsupervised visitation with Jack increased to four hours a week, but within a month, Jack started refusing to participate in visits with Z.B. In addition, he was suspended from school twice for fighting.

---

[5]    Z.B. retained the right to make educational decisions relating to Jack. Although Shannon strongly believed that it was in Jack's best interests to repeat third grade so that he would acquire the fundamentals he needed, Z.B. disagreed.

[6]    The record suggests that Z.B. remained unemployed and was in the process of being evicted from her home, as of December 2013.

Meanwhile, the juvenile court terminated reunification services for D.B. and set a section 366.26 hearing relating to Jack. Although Shannon and Scott had originally planned to seek legal guardianship, Shannon became convinced that Z.B. was not being honest about her plan to stay sober. The couple decided to pursue adoption to provide Jack with a stable living environment.

In October 2013, the Agency suspended Z.B.'s unsupervised visits with Jack after she showed up drunk at a program at Jamie's preschool. At about the same time, Z.B.'s brother, K.B., reported to the Agency that Shannon had sexually abused him over a period of several years beginning when she was 16 and he was 10 and that Shannon and Scott had physically assaulted him on other occasions over the years.[7]

Although the Agency found K.B.'s revelations suspicious given the length of time that Jack had been in Shannon and Scott's care, the recent change of the long-term plan from guardianship to adoption and the imminence of the section 366.26 hearing, it investigated his allegations to determine whether the circumstances demonstrated a risk of harm to Jack or his siblings. Shannon vehemently denied the allegations and the children all reported that there was no abuse or neglect in the home and that they were happy there. In addition, Jack's therapist reported that his situation at home and at school was very stable and that he was showing improved self-esteem and a positive attitude toward school. The Agency closed its investigation of K.B.'s allegations as unfounded.

---

[7] K.B. suffered from cerebral palsy and bipolar disorder with schizophrenic tendencies. He had lived with Shannon and Scott for periods of time as an adult and Shannon and Scott had had to call the police on four or five occasions when K.B. had violent outbursts; on two of these occasions, he was taken to County Mental Health.

While the investigation was ongoing, Z.B. voluntarily submitted to an outpatient treatment program at the McAlister Institute, and reported a sobriety date of November 6. She maintained supervised visitation with Jack, although he refused to see her for two of the scheduled visits, and there was little contact between the two otherwise. On one of the visits, Z.B. took Jack to a firing range despite Shannon's concerns about her doing so; the next day, Jack was suspended from school for bringing live ammunition to campus.

In the report and addendum reports prepared for the section 366.26 hearing, the Agency recommended that the juvenile court terminate parental rights to Jack and place him for adoption. At Z.B.'s request, the court set the matter for a contested hearing. That same day, the juvenile court received a letter from the maternal grandmother complaining that the social worker's reporting about Z.B. was unfair, indicating that Jack was unhappy in Shannon's home and asking the court to place Jack with her.

In January 2014, Z.B. filed a section 388 petition, asking that the court remove Jack from Shannon and Scott's home, claiming that their home was unsuitable and unsafe based on K.B.'s earlier allegations of sexual and physical abuse.[8] At the same time, Z.B. rescinded her authorization for McAlister staff to talk with the social worker.

At a contested hearing under section 366.26 and on the section 388 petition, the juvenile court heard testimony from K.B., Z.B., Scott, Shannon and social worker Lauren

---

[8]     Z.B. also filed a second section 388 petition requesting that the court place Jack with her or other maternal relatives. The court's denial of that petition is not at issue on this appeal and accordingly we do not address it further.

Jankowski.[9]  As to the section 388 petition, the court found that K.B.'s claims of having been sexually molested by Shannon when Shannon was a teenager were not supported by credible evidence.  The court further found that even if the allegations were true, they did not establish any current risk of danger to Jack, particularly given that Shannon and Scott had been good, loving and supportive caretakers for him throughout the dependency proceedings.  The court went on to find that although Z.B. had had regular, positive visits with Jack and their relationship benefitted him, Jack was adoptable and the benefits to him of adoption "far outweigh[ed]" the detriment of terminating parental rights.  The court terminated parental rights and referred Jack to the Agency for adoptive placement.

Z.B. and D.B. appeal.

## DISCUSSION

1.  *Section 388 Petition*

Z.B. contends that the juvenile court abused its discretion in denying her petition under section 388, which allows a parent of a child who has been declared a dependent of the juvenile court to petition the court to modify, change or set aside any of its previous orders based on changed circumstances or new evidence.  (§ 388, subd. (a).)  To obtain relief under this statute, a petitioning parent must show not only changed circumstances or new evidence, but also that the requested change is in the child's best interests.  (§ 388; Cal. Rules of Court, rule 5.570(h); *In re Michael B.* (1992) 8 Cal.App.4th 1698, 1703.)

---

9    The court declined to consider ex parte letters, received as the contested trial was on-going, from Z.B.'s mother and a "family friend" alleging that Shannon and Scott's home was dangerous for Jack and that there were important facts not previously presented that the court should consider.

We review the juvenile court's denial of a section 388 petition for an abuse of discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)

Although Z.B.'s section 388 petition and her arguments in the juvenile court were based on the allegations of past sexual conduct by Shannon and physical conduct by Shannon and Scott, her appellate brief attempts to shift focus to Shannon's historical drug use, which Z.B. contends created a present risk of harm to Jack from being placed with Shannon. To the extent that Z.B. is not otherwise barred from raising such a challenge for the first time on appeal (see *In re Kevin S.* (1996) 41 Cal.App.4th 882, 885-886), the argument is unsupported by any evidence in the record showing current drug use by Shannon.[10] Accordingly, Z.B. has not shown that the juvenile court's denial of her section 388 petition constituted an abuse of discretion.

2.      *Termination of Parental Rights*

"Adoption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573.) If the court finds a child cannot be returned to his or her parent and is likely to be adopted if parental rights are terminated, it must select adoption as the permanent plan unless it finds a compelling reason for determining that the termination of parental rights would be detrimental to the child under one or more of the enumerated statutory exceptions. (§ 366.26, subds. (c)(1)(A) & (B)(i)-(vi); *In re A.A.* (2008) 167 Cal.App.4th 1292, 1320.)

---

[10]     Although Z.B. argues that "[i]t would take a heroic suspension of disbelief to conclude that Shannon's statement that she successfully stopped using drugs cold turkey in 2003 is credible," the Agency aptly points out that any suggestion that Shannon must still be abusing substances is entirely speculative.

"The parent has the burden of establishing the existence of any circumstance that constitutes an exception to termination of parental rights." (*In re T.S.* (2009) 175 Cal.App.4th 1031, 1039.) Because a selection and implementation hearing occurs "after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

Z.B. contends that the juvenile court abused its discretion in terminating her parental rights based on section 366.26, subdivision (c)(1)(B), which provides an exception to the adoption preference where terminating parental rights would be detrimental to the child because "[t]he parents . . . have maintained regular visitation and contact with the [child] and the [child] would benefit from continuing the relationship." The existence of an affectionate relationship and a history of pleasant visits between parent and child are not sufficient to trigger application of the section 366.26, subdivision (c)(1)(B) exception. (E.g., *In re Derek W.* (1999) 73 Cal.App.4th 823, 827.) Rather, there must be such a significant, positive emotional attachment between child and parent that termination of the relationship would greatly harm the child and the benefits of maintaining the relationship outweigh the well-being the child would gain in a permanent adoptive home. (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575; *In re Dakota H.* (2005) 132 Cal.App.4th 212, 229.)

In determining whether this statutory exception applies in a particular case, the juvenile court must balance "the strength and quality of the natural parent[-]child

11

relationship . . . against the security and sense of belonging a new family would confer."
(*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)  The juvenile court concluded that
although Z.B. had a continuing and positive relationship with Jack, the quality of the
relationship was not such as to outweigh the benefits of placing him for adoption.  On
appeal, we review this determination for an abuse of discretion.  (*In re Bailey J.* (2010)
189 Cal.App.4th 1308, 1314-1315; compare *In re L.Y.L.* (2002) 101 Cal.App.4th 942,
947 [applying a substantial evidence standard of review].)  We find none.

Although Z.B. had a loving relationship with Jack, she did not serve a parental
role for him.  (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1527 [recognizing that a parent
must have a parental role in the life of her child for the statutory exception to apply].)
Over the course of the current proceedings, her visitation with Jack was at times sporadic,
particularly after her relapse in the spring of 2013.  Moreover, after Z.B. was authorized
to have short unsupervised visits with Jack in February 2013, he began exhibiting
increasingly negative behaviors and, shortly after those visits were increased to four
hours a week in August 2013, he started refusing to attend them.  Jack did not have any
difficulty separating from Z.B. after their visits were over and he had very little contact
with her between visits, even over the holidays.

By contrast, Jack had lived with Shannon and Scott on and off throughout his life
and exclusively beginning in October 2012.  After Jack was placed in their care together
with his siblings, he began to look to Shannon and Scott to meet his needs.  His
behavioral issues at home and in therapy diminished and after Shannon hired a tutor for
him, his academic performance and stress level at school started to improve.  The

12

children were closely bonded to each other and reported that they were happy in Shannon and Scott's home.

On this record, there is no basis on which to conclude that the juvenile court abused its discretion in determining that the beneficial parent-child relationship exception to adoption did not apply.

DISPOSITION

The judgment is affirmed.

_____
AARON, J.

WE CONCUR:

_____
BENKE, Acting P. J.

_____
McINTYRE, J.

13